**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

Walleye Trading Advisors, LLC,

Plaintiff,

v.

Daniel Eisner and D.E. Shaw & Co., L.P.,

Defendants.

Court File No. 07 CV 4105 PAM/JSM

**COMPLAINT**

---

Plaintiff Walleye Trading Advisors, LLC ("Walleye Trading" or "Plaintiff"), by and through its attorneys, complains of Defendants Daniel Eisner ("Eisner") and D.E. Shaw & Co., L.P. ("D.E. Shaw") as follows:

## THE PARTIES

1. Plaintiff Walleye Trading Advisors, LLC is a limited liability company organized and existing under the laws of the State of Minnesota and having its principal place of business at 294 Grove Lane East, Suite 280, Wayzata, Minnesota 55391.

2. Defendant Eisner is a former employee of Walleye Trading who, upon information and belief, is a resident of the State of New York, residing at 200 Rector Place, New York, New York 10280.

3. Defendant D.E. Shaw is an investment and technology firm having its main office in New York, New York. D.E. Shaw is engaged in the business of deploying investment strategies using computer software and is also in the business of managing and developing hedge funds.

SCANNED
SEP 2 7 2007
U.S. DISTRICT COURT MPLS

## VENUE AND JURISDICTION

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. In addition, this Court has personal jurisdiction over the parties, as Plaintiff resides in this District and Defendants committed acts and/or transacted business related to this case in this District. Upon information and belief, D.E. Shaw also conducts business in Minnesota such that this Court has general personal jurisdiction over D.E. Shaw. In addition, Walleye Trading and Eisner specifically agreed to submit to this Court's jurisdiction and Defendant Eisner has either waived venue or agreed to venue in this judicial district.

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because this matter involves a controversy between citizens of different States and the amount in controversy exceeds $75,000.

## EISNER'S EMPLOYMENT WITH WALLEYE TRADING

6. Plaintiff Walleye Trading is a Minnesota-based financial services company that operates hedge funds and is engaged in the highly proprietary and unique business of trading securities in local, national and global markets in the United States and Asia. Walleye Trading, its principals and managers have extensive experience in operating hedge funds and in creating investment strategies, managing risk and successfully operating investment businesses.

7. Walleye Trading has developed and utilized valuable trade secrets and other confidential information during the course of its business. These trade secrets and confidential information give Walleye Trading a distinct advantage over its competitors, including over D.E. Shaw.

8. Walleye Trading has taken reasonable steps to protect its trade secrets and confidential information, including the use of security measures (electronic and otherwise) and by requiring its employees to sign Confidential Employment, Non-Competition, Non-Solicitation and Non-Disclosure Agreements.

9. Defendant Eisner commenced his employment with Walleye Trading in or around July 2005 as a Senior Developer. As a Senior Developer, Eisner's job duties primarily involved developing, implementing and monitoring an information technology infrastructure that provides Walleye Trading with a significant advantage over its competitors. This infrastructure system consists of a combination of software, networks, and computer systems that have been uniquely researched and combined (geographical and technologically) to attain a low cost, high speed, low-latency, replicated and distributed data center architecture (the "Architecture"). The Architecture is a necessary and critical component to Walleye Trading's investment activities. In fact, many of Walleye Trading's confidential trading strategies can be implemented only by using the extremely efficient and effective computer infrastructure of the Architecture.

10. During the term of Eisner's employment, Walleye Trading invested heavily in optimizing the Architecture. It took almost the entire time that Eisner was employed with Walleye Trading to complete the Architecture. Walleye Trading's investments in the Architecture included providing Eisner with tutoring and training in diverse areas such as selecting, evaluating and negotiating with vendors, technology selection, writing software code, implementing software, monitoring the systems, risk management and others. Eisner did not possess the knowledge, skills or competency necessary to implement the systems necessary to implement the Architecture when he joined Walleye Trading. Eisner developed skills in these areas only under the close guidance and supervision of Walleye Trading.

11. During his employment with Walleye Trading, Eisner gained intimate and highly confidential knowledge concerning the Architecture. His duties included all aspects of implementing the Architecture, including identifying data center co-location space, evaluating new technologies, designing and improving software relating to the Architecture and writing code that was necessary to deploy, monitor, mirror and control various aspects of the Architecture. Eisner thus became thoroughly knowledgeable regarding Walleye Trading's confidential strategies and its entire technological infrastructure necessary to implement those strategies.

12. Walleye Trading spent hundreds of thousands of dollars providing Eisner with the resources and training necessary to develop and implement the Architecture.

13. While Eisner joined Walleye Trading as a system administrator with limited skills, with Walleye Trading's guidance, training and resources, Eisner is now capable of rebuilding an infrastructure that replicates the Architecture. Given Eisner's training and exposure to these highly sensitive areas, it is inevitable that Eisner would use Walleye Trading's confidential and trade secret information if he obtained employment with one of Walleye Trading's competitors.

**DEFENDANT EISNER'S AGREEMENT WITH WALLEYE TRADING**

14. On June 22, 2005, Walleye Trading and Eisner entered into a Confidential Employment, Non-Competition, Non-Solicitation and Non-Disclosure Agreement (the "Agreement") pursuant to which Walleye Trading agreed to employ Eisner as a Senior Developer, and Eisner agreed to be so employed. A copy of the Agreement is attached hereto as Exhibit A.

15. Eisner primarily performed his job duties in New York, New York. However, he also visited Walleye Trading's offices in Wayzata, Minnesota and maintained frequent communication with Walleye Trading's Minnesota office.

16. In connection with his employment, Eisner received an initial salary of $120,000 per year and was also permitted to participate in Walleye Trading's deferred compensation plan that tracks the profitability of the firm. Eisner also received bonuses in 2006 and 2007.

17. Section 8 of the Agreement specifically prohibits Eisner from using or disclosing any of Walleye Trading's confidential information at any time:

> **Non-disclosure of Confidential Information**. Employee will not, at any time during employment with Employer or anytime thereafter, directly or indirectly, disclose, furnish or make accessible to any person, firm, corporation, or other entity, or make use of, any Confidential Information of Employer or its affiliates, subsidiaries, or principals. For the purposes of this Agreement, "Confidential Information" means any information that derives independent economic value from not being generally known or readily ascertainable by persons outside Employer. Confidential Information includes, but is not limited to: this Agreement; information protected by Minnesota's Uniform Trade Secret Act; client contact information or information concerning client needs, portfolios or investments; methodologies; training materials of any kind; information related to profits or other financial data; market research and analysis or projections; *proprietary trading techniques and skills used or developed by the company*; products, securities, equities, option sales and other performance information; *information of any kind related to the company's trading or product development practices; computer data files of any kind*; lists of instruments, securities or positions held by the company, its clients or affiliates; marketing or advertising materials; plans, processes, and projections; the identities of the company's employees and independent contractors; *Employer's computer programs, software and computer applications*; company personnel and human resources information; company organizational information; proprietary quantitative trading algorithms; and *the plans, objectives or strategies of Employer*, its affiliates, subsidiaries, principals, investors or clients.
> * * *

(emphasis added).

18. Section 13 of the Agreement is a non-competition provision that restricts Defendant Eisner from working for one of Walleye Trading's competitors for a period of two (2) years, but only if Walleye Trading continues to pay Eisner during the non-compete term:

> **Non-competition Agreement**. Employee acknowledges that Employer will invest a substantial amount of time and resources in training Employee using highly confidential and proprietary training methods, techniques and materials, and that Employer would not otherwise make this training and know-how available to Employee were it not for Employee's strict adherence to all of the terms of this agreement, specifically including Employee's agreement to not use the skills, training, and know-how provided by Employer pursuant to this provision. Employee further acknowledges that Employer's business is of a global nature, involving investments and trading of securities in local, national and global markets, and that the protections contained in this Agreement must also be of a global nature and scope for Employer's reasonable protection.
>
> Accordingly, so long as Employee is employed by Employer, and for a period of two (2) years after Employee's termination of employment (the "Noncompete Term") for any reason, whether voluntary or involuntary, Employee shall not, directly or indirectly, throughout the world, whether as a principal, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity, engage in, have an interest in or become associated with any entity, firm, business, activity or enterprise which is engaged in any business similar to or competitive with Employer; provided, however, that following the termination of Employee . . . the provisions of this Paragraph shall only apply to Employee for as long as Employer continues to pay Employee his or her base salary (subject to all applicable withholding taxes) at Employee's last prevailing rate (excluding any bonuses, benefits or any other compensation) during the Noncompete Term.
>
> * * *

19. In Section 15 of the Agreement, Eisner agreed that the provisions of the Agreement would not prevent him from earning a livelihood, and that Walleye Trading would be entitled to injunctive relief in the event of a breach of the Agreement by Eisner:

> **Injunction**. Employee acknowledges that the provisions set forth in this Agreement are reasonable and necessary in order to protect and maintain the legitimate business interests of Employer, and that their enforcement would not prevent Employee from earning a livelihood, especially given that Employee is skilled in other areas and would only be skilled in the areas protected by this Agreement as a result of the training and know-how provided by Employer. In the event Employee breaches the promises contained in this Agreement, Employee recognizes that irreparable injury will result to Employer, that Employer's remedy at law for damages will be inadequate, and that Employer shall be entitled to seek an injunction to restrain the continuing breach by Employee, Employee's partners, agents, servants, or employees, or any other persons or entities acting for or with the Employee as provided by law and/or equity. Employer may further be entitled to damages in connection with the enforcement of this Agreement as provided in the Plan and by law and/or equity, and including the recovery of any profits and revenues obtained by Employee while engaging in violations of this Agreement in addition to the recovery of any Deferred Bonus.

These remedies are in addition to any other rights and remedies that Employer may have at law or in equity.

20. In Sections 20 and 21 of the Agreement, Eisner agreed to venue and jurisdiction in this Court and to the application of Minnesota law:

> **Consent to Jurisdiction, Service of Process and Venue**. Employee, Employer, and its subsidiaries and assigns consent to venue and jurisdiction in the District Court of Hennepin County, State of Minnesota, and in the U.S. District Court for the District of Minnesota and to service of process under Minnesota law in any action commenced to enforce this Agreement.
>
> **Governing Law**. This Agreement will be construed and interpreted in accordance with the laws of the State of Minnesota.

21. Defendant Eisner also acknowledged having had a reasonable opportunity to review, consider and seek legal counsel concerning all aspects of the Agreement, as set forth in Section 23 of the Agreement:

> **Voluntary and Knowing Action**. Employee acknowledges that Employee has had ample opportunity to review this Agreement and has had the opportunity to consult with an attorney before signing it and before accepting employment with Employer, that Employee understands the terms of this Agreement, and that Employee is voluntarily entering into this Agreement and intends to be fully bound by its terms.

## DEFENDANT EISNER'S BREACH AND D.E. SHAW'S INTERFERENCE WITH THE AGREEMENT

22. On or around July 19, 2007, Eisner voluntarily resigned his employment with Walleye Trading, effective August 3, 2007.

23. By letter dated August 3, 2007, Walleye Trading accepted Eisner's resignation, stated that Walleye Trading intended to pay Eisner his last prevailing salary pursuant to Section 13 of the Agreement, and also reminded him of his continuing non-competition obligations. A copy of letter is attached hereto as Exhibit B. The letter also requested that Eisner provide Walleye Trading with offer letters or job descriptions from future employers so that Walleye

Trading could determine if the proposed activity violated the non-competition provisions of the Agreement.

24. Since the last date of Eisner's employment, Walleye Trading has sent Eisner payment of his regular salary in compliance with Section 13 of the Agreement, thus requiring Eisner to abide by the terms of his non-competition restrictions. On or around September 4, 2007, Eisner accepted and cashed the first two payments sent to him without protest.

25. On August 10, 2007, counsel for Eisner sent a letter to Walleye Trading stating that Eisner had been offered, and had accepted, a position with D.E. Shaw. Eisner's counsel stated that it was Eisner's intention to "[lead] the company's search for new data center co-location space," to find, evaluate and deploy new technologies, and to design and oversee internal software for D.E. Shaw.

26. Upon information and belief, Eisner had already accepted a position with D.E. Shaw prior to submitting his resignation to Walleye Trading.

27. D.E. Shaw is a competitor of Walleye Trading in that both companies are investment firms engaged in the business of deploying investment strategies using computer software and they are both in the business of managing and developing hedge funds. In addition, both companies conduct investment activities in local, national and global markets.

28. Upon information and belief, D.E. Shaw knew about the terms of the Agreement, and particularly about the non-competition term, prior to extending a job offer to Eisner. Nonetheless, D.E. Shaw extended the job offer to Eisner with the intent of obtaining Walleye Trading's confidential and trade secret information concerning its co-location strategies and the Architecture. As evidence of its intent to obtain Walleye Trading's confidential and trade secret information, D.E. Shaw agreed to pay Eisner several hundred thousand dollars more per year

than he was making at Walleye Trading and it was Defendants' stated intent to employ Eisner in the same exact areas in which Eisner worked while employed by Walleye Trading.

29. On August 14, 2007, counsel for Walleye Trading sent letters to Eisner's counsel and to D.E. Shaw stating Walleye Trading's objection to Eisner's employment with its competitor, D.E. Shaw.

30. Notwithstanding Walleye Trading's objections, Eisner and D.E. Shaw's agreement whereby Eisner is to become an employee of D.E. Shaw is still in place and has not be retracted or modified in any way.

31. Instead of honoring the terms of Walleye Trading's Agreement with Eisner, D.E. Shaw has advocated on Eisner's behalf and has stated its intent to employ Eisner in defiance of the express terms of the Agreement.

32. Since August 14, 2007, and as a "preemptive strike," Eisner has now commenced litigation against Walleye Trading in Federal Court in the Southern District of New York. Upon information and belief, and as further evidence of D.E. Shaw's intent to obtain Walleye Trading's confidential and trade secret information, D.E. Shaw is funding, directly or indirectly, Eisner's litigation activities against Walleye Trading. Indeed, Eisner's New York counsel has stated that it is Eisner's intent to move for expedited discovery against Walleye Trading in that preemptive action.

33. Any employment of Eisner by D.E. Shaw will subject Walleye Trading to irreparable harm, loss and damage for which it has no adequate remedy at law.

**COUNT ONE: BREACH OF CONTRACT**
**(WALLEYE TRADING v. EISNER)**

34. Plaintiff restates and realleges each and every allegation matter and thing set forth in paragraphs 1 through 33 as if the same were fully set forth herein.

35. Eisner's acceptance of employment with D.E. Shaw constitutes a breach of Section 13 of the Agreement in that Eisner has now become associated with an entity that is engaged in a business that is competitive with Walleye Trading.

36. Eisner's employment arrangement with D.E. Shaw would result in the inevitable disclosure of Walleye Trading's confidential information in violation of Section 8 of the Agreement.

37. By reason of the foregoing, Walleye Trading is entitled to temporary, preliminary and permanent injunctive relief preventing Eisner, D.E. Shaw, and all those acting in concert with them, from engaging in any employment or other relationship involving Eisner and D.E. Shaw and from using or disclosing any of Walleye Trading's confidential and trade secret information, including and without limitation, information concerning Walleye Trading's co-location strategies or the Architecture.

**COUNT TWO: TORTIOUS INTERFERENCE WITH CONTRACT (WALLEYE TRADING v. D.E. SHAW)**

38. Plaintiff restates and realleges each and every allegation matter and thing set forth in paragraphs 1 through 37 as if the same were fully set forth herein.

39. D.E. Shaw was and is aware of Eisner's contractual obligations with Walleye Trading concerning non-competition and the non-disclosure of confidential information.

40. In deliberate disregard for Walleye Trading's rights under the Agreement, D.E. Shaw intentionally interfered with the Agreement by, *inter alia*, extending a job offer to Eisner, refusing to retract the job offer upon learning of Walleye Trading's objections, advocating on Eisner's behalf, by assisting or encouraging Eisner to commence litigation against Walleye Trading, and by seeking to employ Eisner for the purpose of obtaining access to Walleye Trading's confidential and trade secret information.

41. D.E. Shaw's interference is without justification, and is in direct conflict with Eisner's contractual obligations to Walleye Trading.

42. As a direct and proximate result of D.E. Shaw's tortious interference with contract, Walleye Trading is entitled to damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000) to be proven with specificity at trial, including all of its attorneys' fees and costs pursuant to *Kallock v. Medtronic*, 573 N.W.2d 356 (Minn. 1998).

**COUNT THREE: MISAPPROPRIATION OF TRADE SECRETS (WALLEYE TRADING v. EISNER and D.E. SHAW)**

43. Plaintiff restates and realleges each and every allegation matter and thing set forth in paragraphs 1 through 42 as if the same were fully set forth herein.

44. Eisner was exposed to Walleye Trading's confidential and proprietary information, including and without limitation, information concerning Walleye Trading's co-location strategies and the Architecture. Such information derives independent economic value from not being generally known to, or not being readily ascertainable through proper means by others.

45. Walleye Trading has taken reasonable steps to safeguard its confidential and proprietary information, including conditioning Eisner's employment on his agreement to the terms contained in the Agreement..

46. Eisner and D.E. Shaw have violated Minnesota's Uniform Trade Secret Act, Minn. Stat. §§ 325C.01-.07, through their threatened misappropriation and use of confidential and proprietary information belonging to Walleye Trading.

47. As a direct and proximate result of Defendants' violation of Minnesota's Uniform Trade Secrets Act, Walleye Trading is entitled to temporary, preliminary and permanent injunctive relief preventing Eisner, D.E. Shaw, and all those acting in concert with them, from

engaging in any employment or other relationship involving Eisner and D.E. Shaw and from using or disclosing any of Walleye Trading's trade secret information, including and without limitation, information concerning Walleye Trading's co-location strategies or the Architecture, plus attorneys' fees, compensatory damages and exemplary damages in an amount believed to be in excess of Seventy-Five Thousand Dollars ($75,000.00), to be proven with specificity at trial.

**COUNT FOUR: MISAPPROPRIATION OF CONFIDENTIAL INFORMATION (WALLEYE TRADING v. EISNER and D.E. SHAW)**

48. Plaintiff restates and realleges each and every allegation matter and thing set forth in paragraphs 1 through 47 as if the same were fully set forth herein.

49. As an employee of Walleye Trading, Eisner was exposed to confidential and proprietary information. Such information derives independent economic value from not being generally known to, or not being readily ascertainable through proper means by others.

50. Eisner and D.E. Shaw have threatened misappropriation of Walleye Trading's confidential information through their plan to employ Eisner at a substantially increased salary and in the same area within which Eisner was employed by Walleye Trading.

51. By reason of the foregoing, Walleye Trading is entitled to temporary, preliminary and permanent injunctive relief preventing Eisner, D.E. Shaw, and all those acting in concert with them, from engaging in any employment or other relationship involving Eisner and D.E. Shaw and from using or disclosing any of Walleye Trading's confidential information, including and without limitation, information concerning Walleye Trading's co-location strategies or the Architecture.

**COUNT FIVE: CIVIL CONSPIRACY**
**(WALLEYE TRADING v. EISNER and D.E. SHAW)**

52. Plaintiff restates and realleges each and every allegation matter and thing set forth in paragraphs 1 through 51 as if the same were fully set forth herein.

53. Eisner and D.E. Shaw have conspired and joined efforts, by combining with each other and acting in concert with a common purpose, to unlawfully violate Eisner's obligations to Walleye Trading, misappropriate confidential information, violate Minnesota's Uniform Trade Secrets Act, and tortiously interfere with Walleye Trading's Agreement with Eisner.

54. As a direct and proximate result of Defendants' civil conspiracy, Walleye Trading is entitled to damages in an amount believed to be in excess of Seventy-Five Thousand Dollars ($75,000.00), to be proven with specificity at trial.

55. By reason of the foregoing, Walleye Trading is also entitled to temporary, preliminary and permanent injunctive relief preventing Eisner, D.E. Shaw, and all those acting in concert with them, from engaging in any employment or other relationship involving Eisner and D.E. Shaw and from using or disclosing any of Walleye Trading's confidential information, including and without limitation, information concerning Walleye Trading's co-location strategies or the Architecture.

**COUNT SIX: DECLARATORY JUDGMENT**
**(WALLEYE TRADING v. EISNER and D.E. SHAW)**

56. Plaintiff restates and realleges each and every allegation matter and thing set forth in paragraphs 1 through 55 as if the same were fully set forth herein.

57. Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiff requests a judgment of the Court declaring that Eisner's existing and proposed employment relationship with D.E. Shaw does, and will, violate the Agreement.

## JURY DEMAND

Plaintiff demands trial by jury on all claims and issues properly triable to a jury.

**WHEREFORE**, Plaintiff Walleye Trading Advisors, LLC prays for the following relief:

a. Judgment for Plaintiff and against Eisner and D.E. Shaw, jointly and severally, in an amount believed to be in excess of Seventy-Five Thousand Dollars ($75,000.00) to be proven with specificity at trial, together with all interest, costs, disbursements, and attorneys' fees incurred herein and incurred in enforcing the Agreement;

b. Awarding Plaintiff its damages, costs, disbursements, exemplary damages, and attorneys' fees incurred herein pursuant to Minn. Stat. § 325C.03 or as otherwise may be allowable at law or in equity;

c. Enjoining Defendants, and any person or entity in active concert or participation with them, from utilizing any of Plaintiff's confidential, proprietary or trade secret information, including and without limitation, information concerning Walleye Trading's co-location strategies or the Architecture;

d. Directing Defendants to return to Plaintiff any confidential, proprietary, trade secret, and any other information or property belonging to Plaintiff, including and without limitation, information concerning Walleye Trading's co-location strategies or the Architecture;

e. Enjoining Defendant Eisner, and any person or entity in active concert or participation with him, from violating his Agreement with Walleye Trading, and specifically enjoining Defendant Eisner from engaging in any employment or other relationship with D.E. Shaw;

f. For an award of Plaintiff's costs, disbursements, and attorneys' fees in prosecuting this action; and

g. For such other and further relief as the Court shall deem just and equitable.

**PARSINEN KAPLAN ROSBERG & GOTLIEB, P.A.**

Dated: 9-26-07

By: ______________________
Kevin R. Coan (#29357X)
100 South Fifth Street, Suite 1100
Minneapolis, MN 55402
Tel.: (612) 333-2111

and

**ANTHONY OSTLUND & BAER, P.A.**
Joseph W. Anthony (#2872)
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-2230
Tel.: (612) 349-6969
Attorneys for Plaintiff Walleye Trading Advisors, LLC

THE ATTORNEYS AT LAW

PARSINEN KAPLAN ROSBERG & GOTLIEB P.A.

16/9/5

September 27, 2007

**Kevin R. Coan**
**(612) 342-0324**
**kcoan@parlaw.com**

**Via Messenger**

Court Administrator
United States District Court
District of Minnesota
U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

RECEIVED SEP 27 2007 PM 1:40

**RE: Walleye Trading Advisors, LLC v. Daniel Eisner, *et al.***
**Our File No.: 13444-19**

Dear Court Administrator:

Enclosed herewith for filing please find the following documents:

1. Civil Cover Sheet;
2. Complaint; and
3. A Summons directed to Defendant Daniel Eisner and a Summons directed to Defendant D.E. Shaw & Co., L.P.

Please sign and seal the summonses, and return them to us via our Metro Legal messenger for service upon Defendants. The $350.00 initial filing fee is being advanced by Metro Legal, and is provided herewith.

Thank you.

Very truly yours,

Kevin R. Coan

KRC:cgb:
Enclosures

LAW FIRMS WORLDWIDE MERITAS

479649v1